**WILMS, Admx., Appellee v KLEIN et, Appellants.**

Ohio Appeals, 1st District, Hamilton County.

No. 6176. Decided August 10, 1942.

Floyd Anderson, Cincinnati, and Paul W. Steer, Cincinnati, for appellee.

Bert H. Long, Cincinnati, and Milton M. Bloom, Cincinnati, for appellants.

## OPINION

By MATTHEWS, PJ.

In the trial of this case for wrongfully causing the death of Paul W. Wilms, the defendants moved for an instructed verdict at the close of plaintiff's evidence and at the close of all the evidence. These motions were overruled. The jury returned a verdict for the plaintiff. Thereafter, and within three days, the defendants filed two motions, one for a new trial and the other for judgment notwithstanding the verdict. The court overruled the motion for

judgment notwithstanding the verdict and granted the motion for a new trial.

On May 21st, 1942, the defendants filed a notice of appeal "from the overruling of the motion of the defendants for judgment notwithstanding the verdict of the jury rendered on January 9th, said motion being overruled on the 21st day of May, 1942."

On June 5th, 1942, the plaintiff filed a "Notice of Cross-Appeal" from the "order of the trial court entered on the 21st day of May, 1942, overruling the motion of defendants for judgment notwithstanding the verdict and granting the motion of defendants for a new trial and setting aside the verdict of the jury rendered on January, 9th, 1942.".

The defendant appellants have filed a motion in this court to dismiss the cross-appeal. The case has been fully argued upon the record, with the understanding that the scope of the review would be affected by our ruling upon the jurisdictional question raised by the motion to dismiss the cross-appeal. We will, therefore, consider the motion before passing to a consideration of issues within our jurisdiction as determined by the ruling upon the motion.

In **Steiner v Custer, 137 Ohio St., 448,** the court held that, in the absence of an abuse of discretion, the granting of a motion for a new trial is not a final order from which an appeal may be taken, and, that, "The meaning of the term 'abuse of discretion' in relation to the granting of a motion for a new trial connotes more than an error of law or of judgment; it implies an unreasonable, arbitrary, or unconscionable attitude on the part of the court."

It is not contended that the action of the trial court was an abuse of discretion as thus defined; and it is conceded that this court would not have jurisdiction to entertain an independent appeal from the order granting a new trial.

But the plaintiff points out that the defendants have invoked the jurisdiction of the court to review the order overruling their motion for judgment nothwithstanding the verdict, and contend that this enables the court to pass not only upon that order but also upon the order granting the new trial. Two grounds are assigned as the foundation for this contention. The first is, that as the defendants had an undoubted right to appeal from the order overruling the motion, the equal protection clause of **Article I, section 2** of the **Ohio Constitution** as well as the equal protection clause of the 14th Amendment of the Constitution of the United States requires that the plaintiff be given a reciprocal right to appeal from the order granting a new trial. The second is, that as the jurisdiction of the court has attached, it has discretionary power to review errors not assigned and to review the entire record to determine whether prejudicial error has intervened, and, then to affirm, reverse, or modify the judgment to conform to substantial justice as disclosed by the entire record. Let us consider these two grounds.

(1) Does the fact that the defendants have, and exercised, the right to appeal from a final order overruling their motion for

.judgment, confer upon the plaintiff the right to invoke the jurisdiction of this court by filing a notice of cross-appeal from an interlocutory order granting a motion for a new trial?

It should be observed here that the jurisdiction of this court is limited by the **Constitution of Ohio** (Art. IV, Sec. 6) to reviewing judgments, and the Supreme Court has held that an order overruling a motion for judgment comes within the definition of that term, as used in the constitution, (**Cincinnati Goodwill Industries v Neuerman, 130 Oh St 334**) and that an order granting a new trial does not, in the absence of an abuse of discretion. **Hoffman v Knollman, 135 Oh St 170; Steiner v Custer, supra.** And parties cannot by agreement or action enlarge that jurisdiction.

In order that the question presented may be clearly outlined, it should be stated that the granting of a motion for a new trial is not the counterpart or correlative of an order overruling a motion for judgment. Neither the right nor the remedy is reciprocal. The latter motion can only be granted when it appears on the undisputed facts that the defendant is entitled to judgment as a matter of law. The granting of a motion for a new trial rests in the sound discretion of the court and may be based on reasons without number. Nine grounds for a new trial are stated in the motion therefor in this case.

We are therefore of the opinion that the factual basis ▮▮▮▮▮▮▮▮ ▮ for reciprocal remedies based on reciprocal rights does not exist, and that there is no denial of the equal protection of the law.

Counsel relies on certain cases. We have examined them and believe they are distinguishable. Hilton v Dickerson, 108 U. S., 165; Walsh v Mayer, 111 U. S., 31; The Jessie Williamson, 108 U. S. 305; and The Sydney, 139 U. S. 331, are cases in which the court examined the whole record to determine whether the requisite statutory amount to confer jurisdiction was involved. There was no question as to the finality of either order, the only question being as to the jurisdiction of the court to review the order which was the basis of the cross-appeal, because the amount involved in it considered separately was less than the statutory amount. The whole record showed that the jurisdictional amount was involved. There is no such question in this case.

Counsel also relies upon certain cases in which statutes giving a right to appeal have been construed. Among these cases are Haywood v Sencenbaugh, 235 Ill., 580, 85 N. E. 939, and Hecker v Ill. Central Ry. Co., 231 Ill., 574, 83 N. E. 456. All that these cases decided, as we understand them, was that a statute that gave a right of appeal to one litigant and denied it to another would be "special legislation and obnoxious to the constitution." Of course, if it had been attempted to give one litigant a right of appeal from an order overruling his motion for judgment and deny to the other the right to appeal from a similar motion filed by him, the attempt would fail because of the requirement of the "equal protection" of

the law, which means "the protection of equal laws" for all those similarly situated. Because a statute gives all litigants without discrimination a right to appeal from an order overruling a motion for judgment does not require it to give to any litigant a right to appeal from an order granting a new trial.

(2) Has the court discretionary power to consider the validity of the order granting a new trial in the exercise of its jurisdiction invoked by the defendants' notice of appeal from the order overruling their motion for judgment? Certainly, the court has no discretionary power to expand its jurisdiction beyond the power conferred by the Constitution. It therefore has no power to segregate the order granting a new trial and pass judgment upon it as such. Its power, if it exists must result from the relation that the order granting a new trial has to the order overruling the motion for judgment, and as already observed the two are based upon entirely different considerations. Even where there are more than one appealable order, an appeal from one order does not bring before the court any order other than the one appealed from. And certainly, non-appealable orders, such as those granting new trials, would not be brought before the court for stronger reasons.

This subject was discussed in the recent case of **Howk v Kritzer, 140 Oh St 100,** where the court said at 109:

"An appellee under the new procedural act must file his assignment of error and a cross appeal asking reversal of a judgment erroneously prejudicial to him of which the appellant does not complain in his specification of error, in order to preserve his claimed error for review."

It is true that an appellate court has discretion to consider errors not assigned that affect the judgment under review (§12223-21 GC) but that is an entirely different thing from considering errors that affect some order other than the one to review which the court's jurisdiction was properly invoked.

The motion to dismiss the cross-appeal is sustained.

That brings us to a consideration of the appeal from the order overruling the motion for judgment notwithstanding the verdict. This presents the question of whether there is substantial evidence in support of every essential element of the cause of action for wrongfully causing the death of Paul W. Wilms alleged by the plaintiff. The appellants assert that there was a complete failure of proof of any wrongful act or neglect causing his death. In reaching a conclusion, we must give the plaintiff the benefit of every reasonable inference of which the evidential data is susceptible, and, if, so construed, a cause of action appears the trial court was right in overruling the various motions of the defendants-appellants for judgment in their favor.

The decedent was an employee of Lillie, Dickman Reinhardt,

doing business as O. H. Dickman Fish Company, with his place of business at 9 and 11 East 2nd Street, Cincinnati, Ohio, which she had occupied as a tenant of the owners for many years, who at the time the decedent met his death were Margaret Klein and Charles W. Richt. The latter died during the pendency of this action, and it was revived against Margaret Klein, Executrix of his last will. There are two buildings on the premises, but as they were under common ownership and devoted to the same use, openings had been made in the partition wall on each floor, so that those desiring to do so could pass freely from one to the other. There was an electric elevator in Number 9 and an hydraulic elevator in Number 11, where the occurrence resulting in decedent's death took place. That building was five stories high and the elevator shaft extended from the basement to the top story.

In the course of the business of O. H. Dickman Fish Company various articles, principally barrels or casks filled with fish, and empty barrels or casks, were carried from one floor to another on this hydraulic elevator. The elevator consisted of a platform suspended by a cable with lifting equipment, all in an open shaft. The platform was slightly less than twenty-five feet in area. The water pressure was capable of lifting a load variously estimated at from 5,750 to 10,000 pounds, and this pressure was regulated by two cables extending through slots or holes in the platform from the bottom to the top of the shaft. The movement of the platform could be controlled by means of these cables by the operator standing on the platform, or on the floor of the building at the entrance to the shaft. The rated capacity of the elevator was 2,000 pounds.

The speed of the elevator was normal and did not exceed one hundred feet per minute in ascending and less in descending.

The floor of the hydraulic elevator was made of wood supported by wooden cross beams.

On March 4th, 1940, the decedent and Anthony Schnur, another employee, were engaged in cleaning the third floor of debris. They needed a container and both went to a lower floor by way of the stairs to get a cask or barrel to serve their purpose. The decedent tarried on the lower floor for some purpose and Schnur again used the stairs to return to the third floor. He was about fifteen feet away from the elevator shaft when he heard a noise which caused him to rush to the shaft. It is very doubtful whether he saw the decedent after he left him on the lower floor until he looked down the elevator shaft and saw him lying at its bottom thirty-five feet below the level of the third floor. He certainly caught no more than a glimpse of Wilms as he was falling. There was no witness to the accident resulting in the decedent's death, but knowing his intention we are able to reconstruct the broad outline of the accident from circumstantial evidence.

It is clear that the decedent placed a barrel or cask on the elevator at the lower floor level, got on the elevator, started it and proceeded upward until the barrel struck a beam supporting the third

floor. This could have happened only because the barrel extended beyond the elevator shaft. A test between the tensile strength of the barrel, the elevator equipment, and the lifting power resulted. Unless interferred with, it naturally would continue until the capacity of one or the other forces invloved was exceeded or a stalemate resulted. The floor yielded and it, the barrel, and the decedent were precipated to the bottom of the shaft and the decedent received injuries from which he died on the same day. The circumstances show that the floor did not yield until the pressure was much greater than that applied in the normal operation of the elevator.

An examination after the accident disclosed that some of the cross-boards of the platform had broken, and the ends forced out of the surrounding wood frame thereby permitting the platform to fall to the bottom of the shaft. The examination also disclosed that these cross-boards had rotted to a certain extent, but whether to the extent of making them too weak to support a load to the rated capacity of the elevator does not appear. Whether they broke because they were weaker than the other parts or because the pressure was more directly applied to them cannot be determined from the record.

The elevator was an old one located in the flood district of the Ohio valley and had been submerged in water many times. It had been inspected regularly by the city inspectors and by experts employed by the Dickman Fish Company. Inspectors' reports, covering a period of ten years prior to this accident, were introduced, showing many orders to repair, all of which were complied with except the orders in the last report which is dated March 26th, 1940. which were to "Put all gates in good working order. Install a new piece of cable on safety on side of car. Reset the automatic." As none of these parts failed or had anything to do with the accident, it is manifest that the failure to comply with the order is immaterial. The delay in complying is explained by the testimony that a flood intervened, and that there was very little use for the elevator at that season of the year. However, the testimony is that the employees were instructed not to ride on the elevator until the order had been complied with, but notwithstanding some of the employees did ride on it to the knowledge of some of the superior officers of Dickman Fish Company.

We think that the Dickman Fish Company had a right to assume that the inspection showed a sound condition of the elevator in all other respects at that time which was two days less than two months before the accident.

Now it is manifest that this accident occurred as the result of a stress being placed upon the elevator in a way never intended. It was not the kind of stress in contemplation in the commercial use of the elevator, but rather the kind to determine the maximum stress required to break the weakest part. The lifting capacity was more than double the rated capacity which, of course, was intended to

be much lower than the maximum capacity and this difference was the margin of safety. By reason of this barrel coming in contact with the beam, this margin of safety was cancelled, and unless the resisting power of the equipment equalled or exceeded the applied power, the weakest part was sure to break unless the power was removed, which was not done in this instance. We do not know why the decedent failed to turn off the power. It may be that he did not have time after the contact and before the floor gave way. The means were within his reach and it could have been done almost instantaneously.

Now the plaintiff contends that the record shows a violation of duty toward the decedent in several respects directly causing his death. We will consider them in the order set forth in the brief.

(1) By **Section 1027 GC**, it is provided that: "The owners and operators of shops and factories shall make suitable provisions to prevent injury to persons who use or come in contact with machinery therein or any part as follows: * * * They shall * * * examine frequently and keep in sound condition the ropes, gearing and other parts of elevators."

The failure of the defendants to perform this statutory duty would impose upon them a liability for all damage that directly resulted from such failure. Such failure would be characterized as negligence. It will be observed, however, that in this respect the quoted part of the section imposes no specific duty—states no definite rule—in express terms, by which to determine whether the owner or operator has complied with the prescribed duty. In that situation we must have recourse to rules of statutory interpretation.

It is clear that the statute does not make the owner or operator an insurer of the safety of persons using or coming in contact with the elevator. The language is entirely inept for that purpose. He is required to examine "frequently", but what constitutes a frequent examination is dependent on time and circumstance. It is relative not absolute. It certainly means happening at short intervals, but there is no rule of thumb by which to decide when an interval is short or long.

The evidence in this case shows that the city inspectors examined this elevator twice a year and that inspectors employed by the lessee examined it once a month. There is no evidence that these examinations were infrequent when gauged by any established standard or that the examinations, though frequently made, lacked the thoroughness required by established standards of a higher order that would have disclosed any undiscovered defect. How can the court say that the number or the nature of the examinations was a breach of duty, or that there is substantial evidence on that subject to be submitted to the jury in the absence of any evidence of custom or practice on the subject? Is there evidence of unreasonable risk resulting from such inadequacy of inspection? We find none and do not understand that the plaintiff suggests any practiced or practical inspection that would have dis-

closed a defect. We believe the principle announced in **Engelhardt. v Phillips, 136 Oh St 73,** is applicable here.

Now **Section 1027 GC,** did require the owner or operator to keep all the parts of the elevator in sound condition and the question is whether there is any evidence of a breach of this duty. The elevator was not under the exclusive control of the defendants. The decedent was operating the elevator, arranged ■ the setting and applied the power that caused the accident. No inference of negligence can arise from the mere fact that the floor gave way to the applied power. The doctrine of res ipsa loquitur has no application. **29 O. Jur. 640.**

The provision requiring the owner or operator to keep the elevator in sound- condition does require him to keep the parts. sound, that is, free from flaws and defects, and to ■ keep them firm, strong. and safe, but it certainly does not make him an insurer of the indestructibility of the elevator and all its parts. In neither its primary meaning nor in any connotation is it synonymous with perfect. It is synonymous. with safe, as that term is defined in §§871-13, 871-15 and 871-16 GC.. **Subdivision 4** of **§1027 GC,** was construed in **Kuhn v The Cincinnati Traction Company, 109 Oh St 263,** and the court held as stated in the second and third paragraphs of the syllabus that:

"2. While it is the duty of the employer to 'examine frequently and keep in sound condition the ropes, gearing and other parts of elevators,' that statutory duty would be discharged if there was frequent examination by the employer. and the ropes, gearing, and other parts of the elevator were kept as free from danger to the life, safety and welfare of the employee using the elevator as the nature of the employment would reasonably permit, and if the employer furnished, provided, and used safety devices and safeguards and adopted and used methods reasonably adequate to. render the use of such elevator safe within the meaning of the statute. The word 'sound', as used in **subdivision 4** of **§1027 GC,** has the same significance as the word 'safe', as defined in **§871-13 GC,** to-wit, as free from danger to the life, safety and welfare of the employee as the nature of the employment will reasonably permit."

"3. **Subdivision 4** of **§1027 GC,** does not create an absolute liability, nor constitute an insurance of the safety of an employee, but, in an action based upon a violation of such subdivision. an employer may show by way of defense that he has met the degree of care required by statute."

So the question here is whether there is any substantial evidence of a failure of the defendants to discharge their statutory duty to make frequent inspections and to keep the elevator in as sound condition as the nature of the employment would reason-

ably permit. The nature of the employment did not require the placing of this barrel in such a position as to produce the maximum tension upon all the parts of this elevator. We find no substantial evidence of a violation of the provisions of §1027 GC.

(2) Next it is urged that the defendants failed to comply with the provisions of Bulletin No. 110 promulgated by The Industrial Commission of Ohio under authority conferred on it by §871-22 GC. This bulletin required that—"All freight elevators having a lifting capacity exceeding 3,000 pounds, a normal car speed exceeding 75 feet per minute, or a platform area exceeding 40 square feet, shall be constructed with steel or wrought-iron suspension frames."

Now the word "frame" without any qualifying or limiting modifier would be broad enough to include metal cross pieces under and supporting the floor of this elevator. The difficulty in giving it so broad a meaning is that The Industrial Commission did not use the term without qualification. It does not require that the elevator be supported by metal frames. The requirement is that there should be suspension frames. That means that the frames referred to should be above the elevator and the elevator be attached to them from below. As we construe the evidence, this elevator was so equipped. There was no failure of any part from which the floor was suspended. Furthermore, the floor was suspended from metal rods on the sides which were attached to a metal cable by which the floor or cab was raised or lowered in the elevator shaft. The metal rods were joined together in some fashion by metal chains located under the floor. There is no claim of any defect in any of these metal parts. It was the floor that yielded to the pressure and tore loose from the suspending apparatus. If the Bulletin should be construed to require a metal perimeter for elevator floors and that this elevator floor was not so constructed, the plaintiff's case is not helped, because it is clear that the outer timbers into which the floor boards were fitted and by which they were supported did not fail. It was the boards of the floor that failed. So that even though the Bulletin should be construed to require a metal perimeter, its violation had no causal relation to this accident.

(3) There is evidence that there was no artificial light on the elevator or in the building at the point where the barrel was placed on the elevator and that whatever light might have come through a window about twenty feet away was limited by cooperage that had been piled in the intervening space, so that it was dim there. There is in evidence an order of the Industrial Commission requiring all elevator cars to be properly lighted. It is argued that had it not been for this the decedent would not have placed the barrel on the elevator with a part extending beyond the edge of the platform.

But the decedent was entirely familiar with this elevator and its surroundings. He entered it and proceeded to manipulate the power equipment. The platform was about five feet square. The

decedent was, therefore, necessarily close to the edge of the platform and the barrel. How can it reasonably be said that the extent of the light had anything to do with the ability of the decedent to locate the edge of the platform or to so place the barrel on it that no part would extend over? Or to determine that the barrel as it passed would strike the beam one story above? There was no evidence that the light was obscure where the beam was or that decedent could not have seen that there would be a collision as the barrel approached the beam—and before the collision.

We are of the opinion that there is no substantial evidence that the condition of the light, or the absence of a light in the elevator, had any causal relation to this accident.

(4) Call it negligence or not, we find it impossible to escape the conclusion that the decedent's death was the result of his own act. He alone was in charge of the elevator. He so adjusted and manipulated it as to bring about a conflict between the power and the material and stood by in a position of peril while that conflict progressed to the point where the material yielded to the superior power. He had been given no assurance by any one that the elevator would be a safe place under such circumstances. Such a strain was not required by the purpose of the elevator or in the contemplation of any one. The decedent was solely responsible for bringing about this situation and we are of the opinion that no cause of action in his favor could arise, whether it be expressed in terms of no negligence of the defendants directly causing his death, or contributory negligence on his part.

Many of the details of this accident cannot be determined from this record. We do not know exactly what the decedent did in getting on the elevator, in placing the barrel on it, in starting the elevator, what he did as the elevator progressed upward and at the time of the collision. Had death not resulted he, perhaps, could have given his version. As it is, all such details are left to speculation and conjecture. Liability cannot be imposed on such a basis. Whether the decedent's testimony, if available, would have furnished sufficient basis for submission of the case to a jury, we cannot, and need not, determine. On the record, as presented, we are of the opinion that the defendants' motion for judgment notwithstanding the verdict should have been sustained.

The order of the trial court overruling the defendants' motion for judgment notwithstanding the verdict is reversed and set aside, and the cause remanded with instructions to sustain said motion and render final judgment for the defendants.

ROSS, J., concurs.