GERTRUDE J. YOUNG and WILLIAM H. YOUNG, Plaintiffs, v. MICHAEL SAROUKOS, Defendant.

(*October* 24, 1962.)

LYNCH, J., sitting.

*Harrison F. Turner* for Plaintiffs.

*Hugh L. Corroon* (of Berl, Potter and Anderson) for Defendant.

Superior Court for Kent County, No. 54, Civil Action, 1961.

LYNCH, J.:

Plaintiffs sued defendant as the landlord of an apartment house in Dover, known as Kent Apartments, to recover damages for personal injuries sustained by plaintiff, Gertrude S. Young, as a consequence of a fall on a ramp entrance to the Kent Apartments, allegedly caused by accumulations of snow and ice thereon.

Mrs. Young was a tenant in one of the basement apartments in the building. She claims she fell about 9:30 P.M. on the evening of March 4, 1960 while proceeding down the ramp entrance en route to the door of her basement apartment. Plaintiff contends that defendant, as the landlord, was under a duty (1) to keep the ramp entrance free and clear of ice and snow; (2) that the ramp was not properly lighted and (3) that the defendant should have constructed hand rails on the ramp.

Defendant's answer denied the several negligences charged against him; it also pleaded plaintiff's contributory negligence and assumption of risk.

The case came on for trial to the Court on March 29, 1962. At the conclusion of plaintiff's case defendant moved for judgment and the motion was renewed when the trial was concluded. These motions were taken under advisement and the Court directed counsel for the parties to exchange briefs in support of their respective positions. Briefs have been filed and the case is now ready for disposition.

The Kent Apartment was formerly a school building in Dover. It has been converted into a number of apartments. Plaintiff was a tenant in a basement apartment. The principal —if not the only—means of ingress and egress to plaintiff's apartment was by means of a paved ramp that leads up from the entranceway to her apartment to the sidewalk level. It appears from the evidence that the ramp has a 13.18% grade from the street level down to the entrance and doorway to Mrs. Young's apartment.

Plaintiffs made no showing of any accumulations of snow and/or ice on the ramp from previous snow falls.

About 7 to 8 inches of snow fell in Dover on March 3, 1960, continuing into March 4, 1960, and with some continuing snow flurries late in the evening of March 4, 1960. Temperatures were in the low 20's on both days and the winds were high with gusts measuring 38 to 50 m.p.h. at times.

Mrs. Young left her apartment about 8:00 P.M. on the night of March 4, 1960 to go visit a friend who lives in the same apartment building. The entranceway to this friend's apartment is different from the one providing access to the Young apartment, requiring plaintiff to go up the ramp and thence along the sidewalk in front of her apartment, then along a side entranceway to the door of her friend's apartment. The sidewalk and this side entranceway were unprotected from the elements.

Mrs. Young testified that when she left her apartment the snow condition was "not too bad. I could get along all

right"—some snow was on the ground as she left for her visit but "I didn't really look, to tell you the truth".

Mrs. Young's testimony concerning the ramp, her use of it and the like is all quite interesting and is set out in her own language.

"Q   Did you ever have any trouble getting up and down this ramp entrance before this time?

"A   No, sir.

"Q   And had you gone up and down the ramp in snow conditions before?

"A   Yes.

"Q   How many times, would you say?

"A   Well, I don't know. Every time it snowed from the time I went in. I went in there, I think it was in November. I am pretty sure I went in in November.

"Q   Yes, you have told us about that. So every or most times it snowed during that winter of '59-'60 you used the ramp?

"A   Yes."

I find from Mrs. Young's testimony and that of Mr. Varca, witness for plaintiff, that the ramp slope and area were not dangerous *per se* and could be used, even in snowy weather without any undue possibilities of damages; plaintiff did not introduce any testimony regarding the need for guard rails.

Defendant had placed an electric light in the center of a portico over the entranceway to the doors of the two basement apartments. Plaintiff's attorney contended it was inadequate.

Mrs. Young had testified she didn't remember if there was ice or snow on the ramp as she left to make her visit say-

ing that "I don't remember even looking when I went up" to make her visit. She then testified:

"Q Tell me, did that light over the—well, between the two basement apartment entrances, did that illuminate the area of the ash cans—the trash cans? Excuse me.

"A What do you mean? Could I see the trash cans?

"Q Yes, and the area around them.

"A Yes, you can see the trash cans from that light.

"Q And the area around them?

"A Yes.

"Q Your answer is, yes?

"A Yes."

In light of this testimony I find that the lighting over the door to Mrs. Young's apartment illuminating the entranceway and the ramp was adequate, see *Frelick v. Homeopathic Hospital Ass'n*, 1 Storey 568, 574, 150 A. 2d 17 (1959).

Having completed her visit to her friend Mrs. Young left her friend's apartment about 9:30 P.M. Testifying in response to her attorney's inquiries as to her return to her apartment, she said:

"Q Now, upon your return would you describe the condition of the surface of the ramp?

"A * * * I came down from her apartment, and it was snowing or sort of like sleeting * * *."
As she—

"* * * came down the ramp quite cautiously. * * * when I got halfway down the ramp * * * my feet went out from under me and I crashed back onto my back, onto my spine."

Having been asked to describe conditions on the ramp, she said:

"A   It was slippery, and I proceeded with caution from the gate down. But when I got, as I say, halfway down, opposite those garbage cans is where I fell. It was really slippery, and I could feel ice under my hands when I got up, to try to get up.

"Q   Can you describe the surface as to accumulation of snow?

"A   No, I really couldn't tell you how much snow there was. I was in too much pain to even notice very much about it that night.

"Q   Well, Mrs. Young, I am speaking about when you first went to descend the ramp. Did you notice at that time— can you describe any accumulation on the ramp, or the ramp as to accumulation?

"A   Yes, there was some.

"Q   Can you say how much?

"THE COURT: Did you pause to look to see whether there was ice and snow on that ramp before you went down to your door?

"THE WITNESS: No, I didn't, no.

"BY MR. TURNER:

"Q   Could you clearly see the ramp, Mrs. Young?

"A   Well, pretty well. I was used to going down there." At a later point Mrs. Young testified:

"Q   Now, Mrs. Young, on the evening in question, March 4, 1960, do you have any recollection of noticing any sand or salt ——

"A No, I never saw any salt or any sand on there in all the time I lived there."

Mrs. Young testified in the course of cross-examination:

"Q You didn't even look?

"A No. But I got up the ramp all right. It was when I came back down that I fell.

"Q Yes, I understand. You say it was slippery. How could you tell it was slippery when you left?

"A Well, by the way my feet slipped around a little bit.

"Q Did you take a look at the ramp then when your feet slid around?

"A No, I didn't.

"Q So you never looked at the ramp when you were going up?

"A No, I didn't. I was just going about my business upstairs.

"Q So, then, you didn't see any snow on the ramp at 8 o'clock when you left?

"A No.

"Q Did you have any difficulty getting up to Mrs. Guertin's apartment?

"A No I got up there fine.

"Q What was the condition of the side entrances and steps to the main apartment building?

"A There was snow over there on the sidewalk on the side. It is in the same building that I went. You just go out front and down the side and upstairs.

"THE COURT: Did you say there was snow, or was no snow on the sidewalk going up to this side entrance?

"THE WITNESS: Yes, there was snow.

"BY MR. CORROON:

"Q   How much snow was there, Mrs. Young?

"A   I don't know how to tell you. I don't know how to gauge it. There was just snow, that is all."

Defendant testified that after four in the afternoon of March 4, 1960 he had two men remove the snow that had fallen that day and the previous day. A Mr. Kerrick also testified, saying:

"Q   Describe the area that you shovelled on that day, would you, Mr. Kerrick?

"A   The area we shovelled was—we started at the front entrance on the south side and shovelled to the south gate along the sidewalk, down the ramp, back up the ramp to the north gate, and into the first entrance on the north side, and then retraced the procedure.

\*      \*      \*      \*      \*      \*

"Q   What were the weather conditions at that time?

"A   At that time it was—we had a few light snow flurries. The wind was blowing pretty hard. It caused an accumulation of snow swirls.

"Q   About how much snow was on the ground, would you say?

"A   I'd say approximately 6 to 8 inches.

"Q   Did the wind which you have described have any effect on the area you shovelled?

"A   Yes. It caused slight drifting.

"Q   Had that caused drifting, or did it continue to cause drifting?

"A    It caused slight drifting of loose top snow after shovelling."

One Louie Harris, another witness for the defendant, testified, by way of deposition, that he had lived in the Kent Apartments on March 4, 1960 with his wife and two children and was familiar with the walks and entrances around and into the apartment house. He had been employed by defendant to shovel snow from the walks and entranceways "every time it snowed", and that he shovelled snow on March 4, 1960, starting "a little after three" and was paid at the rate of $1 per hour for 4 hours, meaning he had shovelled snow until about 7:00 P.M.

He worked with Kerrick and helped clear the ramp—leading down from the sidewalk to the front entrance of the building—stating it had been shovelled "twice".

Specifically he testified:

"Q    Would you describe to me as best you can the weather conditions during the time you were shovelling?

"A    It was very cold and windy and snowing.

"Q    And was there snow on the ground after you started shovelling?

"A    Yes, there was.

"Q    Would you describe to me how much you remember, or approximately?

"A    Well, I would say four or five inches, I guess.

"Q    And did the wind have any effect on that snow?

"A    Yes, sir. The wind would blow the snow back and forth.

"Q    And did the wind have any effect on the area that you shovelled?

"A    Yes, sir. Some of it would blow it back into where we had shovelled."

On cross-examination Harris testified:

"Q    * * * in other words, you cleared the entire ramp except for that portion on each side where you stacked the snow, is that correct?

"A    That is right.

"Q    Now, at the time you were shovelling you said it was very cold, windy, and snowing. Did it snow all the time you were shovelling?

"A    Well, it snowed most of the time. And it—you would have flurries and heavy snow, and a little snow, and —

"Q    Did the snow stop when you were shovelling?

"A    Well, it would stop and then start again.

        *    *    *    *    *    *

"Q    All right, when you shovelled the ramp did you get down to the bare surface of the ramp?

"A    Yes, sir.

"Q    Was there any ice on the ramp?

"A    Not at the time, no sir.

"Q    Not at the time you were shovelling?

"A    No, sir.

"Q    Now, was the ramp wet?

"A    Well, it was—I'd say it was damp. Not running water on it.

"Q    But it was damp?

"A    Well, it was a little damp. I can't say that it was wet or damp."

Harris testified further concerning the continuance of the snow and storm:

"Q   When you stopped shovelling had the snow ceased at that time? Was it snowing, do you know?

"A   I don't remember.

*     *     *     *     *     *

"Q   Do you recall the particular evening to the extent of knowing whether you went out or not that particular evening? Or is that in your mind at all?

*     *     *     *     *     *

"A   Yes, sir, I remember it definitely.

"Q   Do you remember whether you went out that evening?

*     *     *     *     *     *

"A   No, sir, I didn't go out.

"Q   You did not?

"A   Not after I went in. I had to put chains on my car that night, and then I went back home.

"Q   Well, now was it snowing when you put the chains on your car?

"A   Yes, it was.

"Q   What time was that?

"A   Well, I'd say two hours after I quit shovelling."

Harris testified more concerning the continuance of the storm:

"Q   What were the wind conditions at the time you stopped shovelling?

"A   It was still on.

"Q   Well, describe to me how the wind was blowing at that time when you quit shovelling.

＊　　＊　　＊　　＊　　＊　　＊

"A   I think it was still about the same as it was while we was shovelling. All the time the weather stayed about the same, the temperature and the wind."

Mrs. Young's testimony was that when she left her apartment to go visiting her friend and neighbor the snow had stopped, but when she left her neighbor-friend at 9:30 P.M. to return to her apartment it was snowing and sleeting. A Mr. Hardie, a witness for plaintiff, a tenant in the same apartment testified that the snow continued, although it seems more likely that the continuing high winds were blowing and drifting the snow,—as a factor in the general storm.

From my review and a studied consideration of all the evidence relating to the snow and the storm I find that the storm was continuing and continued until after ten o'clock on the evening of March 4, 1960,—during the period when Mrs. Young left to go visiting her friend's apartment and when she returned to her own place.

The defendant testified:

"Q   Did you do anything with that ramp after Harris and Kerrick had finished shovelling?

"A   I went up and got a bag of salt, rock salt, and threw it in all two entrances, one to the right and one to the left.

"Q   About how much did you put down, do you remember?

"A   I used two bags, ten-pound bags, but with some

there and some at the gate that you are coming in, north gate, south gate, so the people won't slip.

"THE COURT: In other words, you took a total of 20 pounds, which covered the ramp and these other two gates?

"THE WITNESS: That is right.

*　　*　　*　　*　　*　　*

"Q   All right, what area of the ramp did you spread the rock salt on?

"A   On both areas, on both entrances.

"Q   The entire length?

"A   Yes, close to the door, right to the door.

"Q   Did you start from the gate?

"A   From the gate right down.

"Q   From wall to wall, or just down the entranceways?

"A   Well, from the gate to the wall at the entrance to the door."

Defendant also testified:

"Q   Now, Mr. Saroukos, you testified you had some shoveling done on March 4th. Did you have any shoveling done on March 3rd?

"A   Yes.

"Q   Who did you employ for that?

"A   Myself and a colored boy.

"Q   On March 3rd did you have occasion to place any salt around?

"A   Yes, I did.

"Q   Where did you put the salt then?

"A    On the same direction I did on March 4th.

"Q    Was the ramp shoveled on March 3rd?

"A    Yes, sure.

"Q    Who did it?

"A    I say myself and a colored fellow.

"Q    In other words, both of you worked on the ramp. What time of day was this, Mr. Saroukos?

"A    I don't know exactly what time.

"Q    Was it morning, afternoon, evening?

"A    It was sometime in around noon, I presume.

"Q    Now, Mr. Saroukos, was there snow on the 4th prior to your shoveling?

"A    Certainly, not much but it was snowing, and the wind were drifting it right back.

"Q    It was that snow that you were having shoveled, is that correct?

"A    Well, we did shovel the snow, yes.

"Q    It was the snow that fell on the 4th that you were having shoveled on the 4th?

"A    That is right.

"Q    And the ramp had been cleared the day before, is that correct?

"A    That is correct."

The witnesses who testified before me concerning the clearing of the snow were somewhat impressive in their testimony and I find that defendant did have his premises shovelled and that he placed rock salt in the pathways as he testified.

The question then for decision is whether the facts show the defendant fulfilled his duties as a landlord concerning those portions of the premises as were not specifically covered by the lease of any tenant. This will depend on the extent of the landlord's duty with respect thereto and specifically towards Mrs. Young, his tenant.

A landlord usually is not liable to a tenant or to a member of tenant's family or to a guest of a tenant for alleged defective condition of demised premises. *Seligman v. Simon et al.*, 7 Terry 301, 83 A. 2d 682 (1951) (tenant's customer injured when ceiling fell); and *Villani v. Wilm. Housing Authority et al.*, 9 Terry 450, 106 A. 2d 211 (1954) (tenant's child fell into a natural water course and drowned, the water course had not been fenced); and see *Grochowski v. Stewart*, Del. Super., 169 A. 2d 14, 16 (1961), but compare *Hysore v. Quigley*, 9 Houst. 348, 350, 32 A. 960 (1892), and *Fulmele v. Forrest*, 4 Boyce 155, 86 A. 733 (1913) (damages allowed for tenant's death arising from a fall on stairs from landlord improperly repairing the stairs).

Judge Stiftel considered the liability of a landlord for personal injuries incurred by tenants occasioned by accumulations of ice and snow in *Whalen v. Zolper*, 1 Storey 519, 148 2d 778 (1959), but because of the record then presented, he declined to pass on and determine the question.

Judge Stiftel pointed out (1 Storey 521, 148 A. 2d 780):

"The authorities in this country on the question of whether or not there is a duty on the part of the landlord who has rented a building to several tenants to remove natural accumulations of ice or snow in certain areas such as on porches and steps used in common are not in harmony. The cases on the subject are collected in 25 A. L. R. 1273; 39 A. L. R. 294; 58 A. L. R. 1411; 75 A. L. R. 154; 97 A. L. R. 220, and more recently, in 26 A. L. R. 2d 610. From an examination of certain treatises and of the cases cited in the above A. L. R.

notes, it appears that the authorities are primarily divided between the common-law Massachusetts rule and the so-called Connecticut rule. *Durkin v. Lewitz*, 3 Ill. App. 2d 481, 123 N. E. 2d 151, 155, 156. The Massachusetts rule holds that the relation of landlord and tenant does not impose upon the landlord a duty to remove from common areas under his control ice or snow naturally accumulating there. *Bell v. Siegel*, 242 Mass. 380, 136 N. E. 109, 25 A. L. R. 1261; *Woods v. Naumkeag Steam Cotton Co.*, 134 Mass. 357; 2 *Stevenson* [*on Negligence*] *in the Atlantic States* (1954 ed.), Sec. 513. The Connecticut rule as stated in *Reardon v. Shimelman*, 102 Conn. 383, 128 A. 705, 707, 39 A. L. R. 287, imposes upon the landlord a liability for injuries due to the accumulation of ice or snow, provided he knew or ought to have known of the existence of the dangerous condition existing and failed to exercise reasonable care to provide against the injury because of it. The landlord has the duty to use reasonable care to see to it that the premises are kept safe. *Sheehan v. Sette*, 130 Conn. 295, 33 A. 2d 327, 328.

"The basic difference between the two rules is that under the Massachusetts line of cases, an adherence to the common-law conception of the duty of a landlord is followed, and snow and ice are understood to be temporary obstructions for which a landlord is not held liable, and the Connecticut line of cases follows the more modern approach requiring the landlord to use reasonable care with respect to premises used in common, including the removal of ice and snow. *Durkin v. Lewitz, supra*, 123, N. E. 2d at page 156."

Looking at the treatises, encyclopedias and text books one will find excellent and exhaustive discussions, for instance in *Prosser on Torts*, 2nd Ed., page 465, § 80, and see discussion pages 471/473.

The rule is also discussed and stated in *Harper & James —The Law of Torts*—at § 27.17.

After a detailed and intensive study of the treatises, text books and many cases on the general subject and some law review notes, see 41 *Columbia Law Review*, p. 349, I unhesitatingly choose the Connecticut Rule and hold it is applicable here.

I hold the proper and applicable rule to be that it is the obligation of the owner of an apartment house to exercise ordinary care to maintain the approaches and other parts of the building under his exclusive control in a reasonably safe condition for the use of tenants and their guests. Where a landlord demises separate portions of a building to several tenants, expressly or impliedly reserving to himself control of the common areas, his duty as to such areas is more extensive. Here he must exercise reasonable care to keep such areas in a safe condition for the use of his tenants and their business and social guests, all such persons being regarded, while on the common areas, as invitees of the landlord. I regard and hold that the announced rule applies to these common areas so as to require the landlord to render safe or to remove natural or artificial accumulations of snow and ice.

I adopt, however, as part of the applicable rule, the determination expressed in the Iowa and Virginia cases, *Reuter v. Iowa Trust & Savings Bank*, 244 Iowa 939, 57 N. W. 2d 255 (1953) and *Walker v. Memorial Hospital*, 187 Va. 5, 45 S. E. 2d 898. In the cited Iowa and Virginia cases the Supreme Courts of those states have ruled:

"The authorities are in substantial accord in support of the rule that a business establishment, *landlord,* carrier, or other inviter, in the absence of unusual circumstances *is permitted to await the end of the storm and a reasonable time thereafter to remove ice and snow from an outdoor entrance walk, platform, or steps. The general controlling principle is that changing conditions due to the pending storm render it inexpedient and impracticable to take earlier effective action,*

*and that ordinary care does not require it."* (Emphasis supplied)

I have considered and I reject the holding in *Pessagno v. Euclid Inv. Co., Inc.*, 72 App. D. C. 141, 112 F. 2d 577 (1940).

In light, therefore, of the facts found in this case and the rules of law adopted I conclude, as a matter of law, that the defendant exercised ordinary care in light of the continuing storm, and that he is not liable to the plaintiff on the facts she showed at the trial. Defendant's motions to dismiss are therefore granted.

An order granting judgment to defendant may be presented.