ABRAHAM M. SLOVIN and ELEANOR SLOVIN, Plaintiffs, v. MARTIN J. GAUGER, WILLIAM P. COOKE, DOROTHY MUNROE and ALAN D. DUFF, comprising the Board of Education of Newark Special School District; WILMER E. SHUE, Superintendent of the Board of Education, Newark Special School District; and CHARLES R. GOUDY, Defendants.

(*July* 23, 1963.)

LYNCH, J., sitting.

*Morton E. Evans* for Plaintiff.

*Edmund D. Lyons* (of Morris, James, Hitchens and Williams) for Defendants.

Superior Court for New Castle County, No. 419, Civil Action, 1962.

LYNCH, Judge.

Plaintiff and his wife have sued the members of the Board of Education of Newark Special School District, its Superintendent and the Instructor in Industrial Arts at the Ogletown Junior High School for personal injuries plaintiff Slovin claims he received while acting in a play given at the Ogletown Junior High School on October 25, 1960, while he "was a member of the cast of a play being produced by Brookside Players, an amateur theatrical group". He claims to have been seriously injured; his wife sues to recover for loss of consortium. It may be observed that Mrs. Slovin's claim[1] is dependent on any liability which her husband can establish for the injuries he claims to have received by reason of the al-

---

[1]See *Yonner v. Adams*, 3 Storey 229, 167 A.2d 717 (Super.Ct.1961).

leged negligence on the part of the defendants. Hereafter I will refer to Slovin and his wife as the plaintiff and the defendant School Board members as the defendants.

Four causes of actions are asserted in the complaint. The first is grounded on negligence that Goudy, as an agent of defendants, supplied alleged faulty wooden steps which were unsafe and led to plaintiff receiving his injuries; the second on *res ipsa loquitur*; the third on negligence in that defendants were obligated to provide a safe place and failed to do so; and the fourth recites elements of both *res ipsa loquitur* and negligence.

Defendants filed an answer denying negligence and setting up certain affirmative defenses. The affirmative defenses with which we are concerned are:

## "FIRST AFFIRMATIVE DEFENSE

"The Complaint fails to state a claim upon which relief can be granted."

## "FOURTH AFFIRMATIVE DEFENSE

"All or part of the claim is barred under the doctrine of sovereign immunity."

## "FIFTH AFFIRMATIVE DEFENSE

"The relationship between the plaintiff, Abraham M. Slovin, and defendants was that of landlord and tenant and the plaintiff took the premises as he found them."

After defendants had asserted the Fourth Affirmative Defense, the Attorney General entered the case on behalf of the members of the Special School District and moved to dismiss the complaint, basing his motion on the doctrine of sovereign immunity, which was the basis of defendant School Board members in asserting their Fourth Affirmative Defense.

The plaintiffs, as noted above, filed a motion on June 13, 1962, denominated a "MOTION FOR ARGUMENT"; it asked the Court "to set down for argument" the defendants' First, Fourth and Fifth Affirmative Defenses.

■ ■ I must and do regard this as a motion for judgment on the pleadings or a motion to dismiss. Since some discovery has been taken and an affidavit filed "Matters outside the pleadings were thereby injected into the case". Under the provisions of Rule 12(b), Rules of the Superior Court, *Del. C.*, plaintiff's motion can and must now be "treated as one for summary judgment" and disposed of as provided in Rule 56, Rules of the Superior Court, rather than as a motion to dismiss, or as a motion for judgment on the pleadings, which seemed to be its original purpose. See Vol. 6, Moore's Federal Practice, 2d Ed., ¶ 56.11(1) at page 2058. In passing, I observe it was for plaintiff to disclose all evidence which would have disclosed the existence of a genuine issue of fact, *Sparks Co. v. Huber Baking Co.*, 9 Terry 9, 96 A.2d 456 (Super.Ct.1953), and I assume this has been done.

The defendants have moved for summary judgment. The Court proposes now to dispose of all pending motions.

It appears that by their First and Fifth Affirmative Defenses defendants sought to establish that plaintiff Abraham Slovin on the night he alleges he received his injuries occupied a position of lessee, licensee or even trespasser while using the particular facilities of the Ogletown Junior High School and that since he was injured while occupying one or perhaps another of such status the Board could not be held responsible. The defendants aslo challenge the applicability of the doctrine of *res ipsa loquitur*.

Plaintiff contends that Mr. Slovin was a business invitee and the liability of the defendants must be so measured.

It seems desirable to first determine plaintiff's status with respect to the Ogletown Junior High School and the other defendants before proceeding to consider if plaintiff has shown sufficient facts on which he can premise the *res ipsa loquitur* doctrine, or if the doctrine of sovereign immunity is applicable.

The important facts are that some time prior to October 24, 1960, an unincorporated group, known as the "Brookside Players", arranged to rent or lease the auditorium and adjacent dressing rooms at the Ogletown Junior High School in Newark, Delaware, so they could present a play. These arrangements were made with the representatives of the Board of Education of the Newark Special School District. No written lease or rental agreement has been shown, so that it is assumed the lease was oral. The arrangement was made subject to and in conformity with the Rules and Regulations of the Board, established long prior to the rental date.

The General Assembly has provided by statute, 14 *Del. C.* § 714, that school facilities, such as auditoriums and the like, are to be made available for certain purposes and under certain conditions. The statute is cited in its entirety so that all can understand the several questions presented by and in the pending motions.

"§ 714.  Use of schools for meetings of certain organizations

"(a)   The Board shall allow, on written request, the free use of the school house or school houses under its jurisdiction for farmers' meetings, Grange meetings, public

speakings, lectures, entertainments, church festivals, Red Cross meetings, Y.M.C.A. meetings, political meetings, or for any other purposes which are for the civic welfare.

"(b)  The person making application for the use of a school house for a public meeting shall be responsible for all damage to the property occurring at such meeting, ordinary wear and tear excluded, and upon failure of the person to respond in damages for any such injury to the property, the Board in charge of the school house may refuse all future applications until such injury is repaired without expense to the Board in charge of the property."

Pursuant to this statute the Board promulgated certain Rules and Regulations. These were made part of the record when plaintiffs took the deposition of Mr. Shue, one of the defendants. The pertinent provisions of these Rules and Regulations are set forth—again in order that the several questions presented by and in the pending motions may be better understood:

### "RULES AND REGULATIONS APPLYING TO THE USE OF SCHOOL FACILITIES BY COMMUNITY ORGANIZATIONS

"The use of school facilities shall be limited to community organizations which have as their chief aim the instruction of children or the well being of the community. Such organizations shall be essentially civic in nature and shall be required to pay the minimum charges as approved by the Board of Education. Such charges shall defray the costs to the school district for light, heat, and custodial services.

"The following rules and regulations shall generally apply to all use of school facilities by community organizations:

"1.   Application for the use of specific school facilities on specific dates must be filed in the office of the Superintendent of Schools at least one month prior to the date requested.

"2.   Organizations requesting the use of school facilities shall, through the use of the school facility, be in some way contributing to the general well being of the community or the instructional program of the public schools. Sectarian religious services are not permitted on public school property. Permissive use of school facilities shall be limited to non-exclusive group meetings.

"3.   *   *   *.

"4.   *   *   *.

"5.   *   *   *.

"6.   It shall be the responsibility of the officers of the organization requesting the use of the school facility to enforce all rules and regulations.

"7.   The use of school facilities shall be limited to specific areas for which permissive use has been granted.

"8.   *   *   *.

"9.   *   *   *.

"10.   A regular employee of the school district shall be in attendance in the building at all times when such building is being used by community organizations.

"11.   The community organization using a school facility shall be completely responsible for any damage caused through use by the organization, any of its members, or guests.

*"Rules and Regulations Applying to Certain Areas*

"The investment of public funds in highly mechanized equipment requires the adherence to certain policies by

all organizations using these facilities. Inexperienced persons unaccustomed to the specific use and operation of equipment can not operate such equipment effectively, often increasing breakdowns and necessitating costly repairs. Therefore in the best interest of the school district the following rules shall apply:

"GYMNASIUMS—* * *.

"AUDITORIUMS — Senior High School, Ogletown and Central Junior High Schools

"1. The operation of projection equipment, public address equipment, and specialized stage lighting equipment shall be carried on by trained school personnel under the direction of a faculty member.

"2. Stage sets shall be erected only after prior approval of, and under the supervision of, a faculty member designated as 'Stage Manager' for the particular school.

"3. The operation of ventilating and heating equipment shall be limited to the custodian or other school employees on duty.

"4. All rules and regulations shall apply to practice sessions.

"5. Permission to use auditorium facilities shall limit such use to the auditorium, to dressing rooms, or two rooms for dressing room use, and to public lavatories."

It is clear from the Shue deposition that the Brookside Players paid the requisite fees for "Use of Auditorium and Dressing Rooms" on certain nights, including three rehearsal nights; we must assume, from what is before the Court that the lease was in accordance with the statute and the Regulations of the School District; to

me these constitute and are a part of the lease. The lease agreement gave the Brookside Players permission to use the specific areas noted.[2]

It appears from Mr. Slovin's deposition that he had participated in amateur theatricals in and about Wilmington for about 10 years prior to October of 1960. He was asked to take a part in a forthcoming production to be staged by the Brookside Players, an amateur theatrical group in the Newark, Delaware area, in the Auditorium of Ogletown Junior High School. Mr. Slovin took a part and in the usual course, rehearsed with the others of the cast.

Mr. Slovin stated that because of the nature of the set in use, it was necessary (at least in certain scenes) for entrances and exits to be made at stage left. Mr. Slovin stated further that the permanent stairs at stage left were at the rear of the stage and that access to them was impossible because the door at the stage level at the top of the stairs was locked.[3] Additionally, it appears that there was certain scenery stored there, blocking egress that way. The scenery appears to have been used in some other production and by some other group[3]. Furthermore, the rear wall of the stage was being utilized as the backdrop for the production so that it was not possible for an actor to have crossed behind the scenes to stage right in order to leave the stage.

---

[2]See regulations 5, page 456 supra, and paragraph 5 above.

[3]No effort was made to show that the players or Mr. Slovin asked that the door be unlocked to meet the need of the players in their stage production, nor was it shown that the players could not have moved the stored scenery that blocked the door. There was no duty on the part of defendants in either respect. The players and their guests seemingly were aware of conditions at the school and accepted them. Plaintiff did not show changes in stage settings had been approved; see paragraph 2, top of page 456, supra.

The dressing rooms in the school are located across a small hallway at stage right, approximately midway of the depth of the stage. Directly opposite the dressing rooms and on the stage was a sliding metal clad door which had been opened for access to the stage. The floor of the hallway beside the door was perhaps four feet below the level of the stage and there were no permanent steps there. The door was used by the members of the cast to reach the stage for entrance at stage left. Plaintiff points out that it will perhaps be helpful in visualizing the area further if it is understood that the industrial arts classroom and shop adjoined the rear of the stage and a portion of the classroom immediately adjacent thereto had been roped off to permit the cast and crew to proceed from stage left to stage right (and vice versa) without the necessity of crossing the open stage or going through the auditorium.

Mr. Slovin stated on deposition that on October 24, 1960 (the night before he sustained his injury) defendant Goudy gave the Brookside Players a set of steps to be placed below the sliding doors at stage left. The steps in question were movable in the sense that they were not a permanent part of the structure. They were built by Charles R. Goudy[4], one of the defendants. Mr. Slovin did not know whether the steps were fastened in place. The steps were used by the members of the cast including Mr. Slovin on October 24 without incident.

[4]Plaintiff propounded interrogatories to defendants. Interrogatory No. 1 reads:

"1. Please list the names and present or last known address (indicating which) of each employee of the Board of Education Newark Special School District who occupied the position of dramatic coach or sponsor of student or faculty dramatic groups from the time that the Ogletown Junior High School opened through October 25, 1960.

"If no one employee of the Board was designated in either such capacity during the time in question, please list the name and present or last known address (indicating which) of each employee of the Board who sponsored or was in charge of any student or faculty production, dramatic

On October 25, 1960, a dress rehearsal was scheduled in which Mr. Slovin participated. He had just completed a scene, he had walked off the stage, prepared to descend to the hallway and men's dressing room. As he started to descend, he noticed that another member of the production was walking along the hallway from his right. He waited for her to pass the front of the steps because of the narrow space in the hallway between the foot of the steps and the wall of the hall and dressing room. After she had passed he started down, stepped on the top step and felt the steps move out from under him. He contends that he was thrown through the air, landing in the hallway on the floor, and claims thereby to have sustained his injuries.

Defendant Goudy was examined on deposition and consideration must be given to what he deposed in the Court's consideration of plaintiff's status at the time he alleges he was injured.

---

Note 4—Continued
or otherwise, which utilized the stage and/or auditorium of the Ogletown Junior High School from the time of its opening through October 25, 1960."

The answer made by defendants was as follows:
"Mrs. Louise Goddin
109 Briar Lane
Newark, Delaware
"Mr. Charles Goudy
702 Brownleaf Road
Newark, Delaware
"Mr. Herman W. Morris
4100 Ogletown-Stanton Road
Newark, Delaware

"No person was employed as dramatic coach or sponsor of student or faculty groups by the Ogletown Junior High School from its opening through October 25, 1960. The above persons were the only persons known to the Board and the Superintendent who were involved in the use of the said facilities.

"Mr. Charles Goudy was primarily involved in the stage and lighting from a technical basis and Mr. Herman W. Morris is the School Custodian in charge of the psyhical facilities."

I regard and will treat Mr. Slovin as one of the Brookside Players—the organization that leased the auditorium on the night when plaintiff was injured. He made no effort to differentiate his place in the auditorium from that of the others comprising and making up the "Brookside Players". No effort was made by plaintiff to show he had any relationship to the School Board, other than that occupied by the "Brookside Players"—or perhaps as a guest of such group.

Coming to the particular act which plaintiff says caused his injuries. He makes it clear he was aware that there was a four foot drop from the so called "sliding doors" to the floor of the hallway, immediately outside of such "sliding doors". Plaintiff points to the fact that the School District did not "rope off" this entrance way as it had other portions of the school facilities. On the other hand, I find nothing in the record which would have required such roping off. I consider it was the obligation, under the lease agreement, for the lessees to have respected the lease restrictions and to have acted in this respect. Supra, p. 456.

Plaintiff points to Mr. Goudy's testimony (Pl.B. p. 9) as tending to show a basis for liability on the part of the School District.

I quote from Mr. Evans' brief the particular portion stressed by plaintiff:

"As to defendants' position that plaintiff might perhaps have been a trespasser * * *, it is probably unnecessary to go beyond the testimony of Mr. Goudy. He testified that the door at the rear of the stage was intended to be used to bring scenery from the shop onto

the stage * * *. He did not so testify[5] with respect to the entrance door here in question. "Furthermore, Mr. Goudy was in charge of the stage * * * and said that 'most of the girls and several of the men did use this exit here through the whole production' * * * in addition to the plaintiff * * * and voiced no objections. Furthermore, the affidavit of Mrs. Burt stated that Mr. Goudy *supplied* the steps in question to be used at the entrance in question. Additionally, Mr. Shue testified that the Brookside Players had arranged with him for the use of the stage, auditorium and dressing rooms. Certainly, Mr. Shue or Mr. Goudy had an opportunity to have testified[6] that the use of the particular entrance was a trespass and Mr. Goudy would have and should have advised the plaintiff or any other person to stay away, as he did with respect to the roping off of the main portion of the shop to designate that portion which should be used by the Brookside Players * * *."

I find it difficult—if not impossible—to follow plaintiff's argument here.

We start first, as we must, with the conditions of the lease agreement the School Board made with the Players. That stated what portion of the school premises had been leased to the Players. It was known to Mr. Slovin that there was the four foot drop from "the sliding doors" off the stage to the floor of the hallway; plaintiff points to

---

[5] It is to be noted that Mr. Evans took the deposition of Mr. Shue and Mr. Goudy; as defendants they could under our statute have been examined as adverse witnesses. It was for Mr. Evans to show everything he considered necessary to prove his case, see *Sparks Co. v. Huber Baking Co.*, supra, p. 454.

[6] Plaintiff has made no argument (other than this bare statement) or otherwise shown any duty on the part of these men to have advised Mr. Slovin what portion of the school was under lease to the Players.

a practice of "most of the girls and several of the men" in using this means of exit and he would, by reason thereby, place liability on the School District for Mr. Slovin's injuries because of this practice. Mr. Slovin did not show that the Board knew or should have known that such persons were using this means of exit. How did or could this change then existing arrangements?

Plaintiff points to "the steps in question" as having been supplied by Mr. Goudy; he argues that created liability on the part of the School District when they moved out from under him. He has ignored the terms of the lease agreement; Mr. Slovin, as a member of the players or even as a guest could not ignore the obvious. Mr. Goudy's position is discussed, page 460 et. seq., post.

In my opinion Mr. Slovin's position toward the School District was the same as the members of the "Brookside Players"—and that he is or was a tenant—at best—or the guest of the tenant, the Brookside Players, and as such he took the premises in the condition they existed at the time of the leasing of the premises by the "Brookside Players", *Grochowski v. Stewart*, 3 Storey 330, 169 A.2d 14, 16 (Super.Ct. 1961) ; see also *Young v. Saroukas*, 5 Storey 149, 185 A.2d 274, 281 (Super.Ct.1962) affiirmed by Supreme Court, Del., 189 A.2d 437 (Sup.Ct. 1963). In 32 Am.Jur.—Landlord and Tenant—§ 665, page 530, it is stated:

"* * *. Visitors, customers,[7] servants, employees and licensees in general of the tenant are on the premises as guests, etc., of the tenant, and not of the landlord. Whatever rights such invitations or license from the les-

---

[7] See *Seligman v. Simon* et al., 7 Terry 301, 83 A.2d 682 (Super.Ct. 1954).

see may confer, as against such lessee, as against the lessor it can give no greater rights than the lessee himself has. * * *."

If there is the slightest doubt as to the landlord-tenant relationship, as found and determined above, it is eminently clear that plaintiff was no more than a licensee.

I could find no reported Delaware cases and none were cited in which our Courts have undertaken to define and note the distinction between invitees and licensees.

Resorting to the Restatement of Torts—Negligence—Chapter 13, § 332, we find an invitee defined there as—

"* * * a person who is invited or permitted to enter or remain on land in the possession of another for a purpose directly or indirectly connected with business dealings between them."

In contrast, the Restatement of Torts—Negligence—Chapter 13, § 330, defines a licensee to be—

"* * * a person who is privileged to enter or remain upon land by virtue of the possessor's consent, whether given by invitation or permission."

■ If Mr. Slovin is a licensee the School Board's only duty is not to trap him or wilfully injure him, 32 Am. Jur.—Landlord and Tenant, § 691, p. 570.

■ Plaintiff has wholly failed to show he was on the School District's premises "for a purpose directly or indirectly connected with business dealings between" him and the School; hence, he was not an "invitee" at the time he claims to have been injured.

■ What benefit flowed to the School District from the use of the school auditorium by the "Brookside Play-

ers" or its guests? Absolutely none! It is well known that if one uses the premises of another for his own personal benefit, he is a licensee, not an invitee. *Cook v. 177 Granite St., Inc.*, 95 N.H. 397, 64 A.2d 327 (N.H.Sup.Ct., 1949).

The fact that the Board is compelled by statute, 14 *Del. C.* § 714, to permit the free use of the "school house" to any group or for such statutory purposes as are for "the civic welfare" does not change the status of Mr. Slovin, so as to place him in an "invitee" status. It cannot be ever considered that in passing 14 *Del. C.* § 714, the General Assembly intended users of school facilities be invitees of the School District, and so I emphasize Mr. Slovin was not an "invitee" of the School District.

The School Board was compelled by statute to permit the "free use" of the school facilities in question under the circumstances as demonstrated, and so from the facts presented I hold that Mr. Slovin's status towards the School District was no more than a tenant, or guest of the tenant, or perhaps as a licensee. In any one of these categories it must be said that he took the premises as he found them since no evidence shows there was a wilful disposition to injure him or trap him. The First Affirmative Defense, as pleaded, so far as the School Board defendants are concerned, other than with respect to Shue and Goudy[8] is sufficient.

I come now to Mr. Shue's place in this case. It was not shown in the discovery proceedings that he was at the school the night Mr. Slovin was injured; in fact, he testified he was not; it was not shown he personally

---

[8]The status and liability of these defendants are considered separately from the School Board defendants.

acted in any wise so as to cause or to contribute to such injuries as Mr. Slovin claims he sustained. Mr. Evans points to Mr. Goudy as the person who supplied the steps. Plaintiff did not demonstrate the reason Mr. Shue was named a defendant other than to argue he was the Superintendent of the School District. Legally, that cannot be sufficient to place any liability on him under the circumstances as shown here. He was at best an agent of the Board and if no liability exists as to the Board, none can be placed on Mr. Shue, unless it be shown, factually, he breached some duty he had or owed to Mr. Slovin. This was not done. The defendants' motion for summary judgment is granted as to Mr. Shue.

This leaves for consideration what, if any, claim Mr. Slovin can make against Mr. Goudy, and on what basis?

There is an obvious factual dispute as to who supplied the steps. Mr. Slovin has filed an affidavit made by a Mrs. Bart in which she says Mr. Goudy supplied the steps, which plaintiff says was the cause of his being injured.

Mrs. Bart's affidavit, made August 14, 1962, was in this language:

"That she is Elizabeth Ann Marie Bart, usually referred to as 'Betty'; that prior to and during October 1960 she was a member of the Brookside Players; that she was the director of the production 'Good News' which the Brookside Players were producing during October 1960; that Abraham M. Slovin was a member of the cast; that on Monday, October 24, 1960, Charles R. Goudy brought out from the men's dressing room a set of wooden steps to be used by the cast and production staff in entering and leaving the stage at stage left; that the said Charles R. Goudy placed the steps in the hallway beneath the sliding door at stage left and explained that the boys

(students in his shop) had built the steps; that your deponent knew the said Charles R. Goudy to be the industrial arts or shop teacher and that he was in charge of the mechanical facilities for the benefit of the school; that most members of the cast at one time or another used the steps both on the night of October 24, 1960 and on October 25, 1960, the night on which Abraham M. Slovin was injured."

The affidavit can mean only that the steps were made available to the "Brookside Players", the tenant of the school facilities, and no more. Mr. Slovin, supra, p. 456, concedes this. In making the steps available as claimed, Mr. Goudy was not acting for or in behalf of the School Board. Mrs. Bart was aware the steps were not made secure; she was in charge for the tenant; she identifies herself as "the director" of the play. It was for the tenant to have acted to protect its guests, by securing the steps. I find it difficult to understand why Mrs. Bart was not intelligent enough to see to it that the steps were made secure; had she done so no accident would have resulted and Mr. Slovin would not have been injured.

Mr. Goudy, in his deposition, denies all this. His desposition, given two months before the Bart affidavit was executed, was as follows:

"Q   Mr. Goudy, you are familiar with the steps which Mr. Slovin was descending when he was injured, are you not?

"A   Yes, sir.

"Q   Who built those steps?

"A   I did.

"Q   When did you build them?

"A   Approximately a year before the accident occurred.

"'Q Had those steps been used in other productions in the school?

"'A Yes, on numerous occasions.

"Q By the students?

"A Yes, sir.

"Q And by community organizations as well?

"A No, sir.

"Q Had these steps been used in the preceding year by the Brookside Players in some other production?

"A No, sir.

"Q Who supplied those steps to the Brookside Players in October, 1960?

"A I don't know who supplied them. I did not.

"Q You say you did not?

"A I did not supply them.

"Q I was just about to suggest to you that you had brought the steps out and handed them to one of the members of the Brookside Players, suggesting that they could use them.

" No sir, I did not.

"Q You did not?

"A No, sir.

"Q Where were the steps stored?

"A They were stored in the boys' dressing room, under the counter, the make-up counter that they have in the room.

"Q Were you aware that the steps were being used by the Brookside Players that night?

"A    Yes, I was.

"Q    Were you there both nights?

"A    Yes, sir.

"Q    Were they in fact being used the preceding night?

"A.    I couldn't tell you."

■■■    Assuming Mr. Goudy supplied the steps, does this dispute create a material issue of fact? It is not shown the steps were defective in any sense; nothing more was shown than that they were not somehow secured to the floor so that they would not move "out from under" Mr. Slovin.

What duty was there on Mr. Goudy to have secured the steps? Mr. Goudy—in the position he occupied under the School Board—had no authority to permit the Brookside Players to change the physical characteristics of the auditorium-hallway, thereby enabling the Players to utilize a door—WHICH WAS NOT designed to be used as Mrs. Bart would have liked and did "direct" its use. Mr. Goudy deposed that he was present at the school on the night Mr. Slovin was injured "to render technical assistance on the stage"; he was there as the "faculty member" (see p. 456, supra, regarding paragraph 10 of the Regulations) "designated as the stage manager of the school"—"operating stage lighting equipment". Assuming he did supply the steps, I fail to see that he created or was under a duty to secure them to the hallway floor; they could have been made secure by "Brookside Players". The tenant had no right—without approval of the School Board—to use premises and facilities in a manner not included in the lease arrangement and without Board approval, so Mr. Goudy's relationship to Mr. Slovin, such as it might be,.

cannot and did not go to create any liability on his part to Mr. Slovin, since neither Mrs. Bart nor the Players, the tenant, saw fit to secure the steps.

Mr. Goudy's act must have had some casual relationship to Mr. Slovin's fall, see *Wilms v. Klein*, 49 N.E.2d 76, 82 (Ohio Ct. of App., 1942). It has not been shown it did.

In the absence of more than appears in the record, including the Bart affidavit, I hold that the dispute as to who furnished the "steps" creates no material issue of fact such as will not preclude the Court from ordering judgment on defendants' motion for summary judgment as to Mr. Goudy, if I determine it otherwise should be granted.

Plaintiff has pleaded and argued in his brief the doctrine of *res ipsa loquitur* is applicable and that this precludes any judgment being ordered in favor of defendants.

Generally speaking the doctrine is applicable in any negligence case; but whether it is to be applied can only be determined by a consideration of and in light of all of the facts of the case. In *McGuire v. McCollum*, 10 Terry 359, 116 A.2d 897 (Super.Ct.1955) now Mr. Justice Carey of our Supreme Court indicated when the doctrine is or is not applicable, 10 Terry 366, 116 A.2d 901, in any case.

So far as the doctrine may be applicable in actions of negligence by a tenant or a guest of a tenant as against a landlord necessitates careful consideration of many factors—particularly the "control" element that may be reserved by or to a landlord of the area and/or instrumentality or appliance that has a relationship to the accident exercisable by the landlord, both as to the premises and the offending instrumentalities. This is so because of the

usual relationship of a tenant and landlord; the tenant usually is given complete and unreserved possession and this usually includes "control" of the premises, even to the exclusion of the landlord. Certainly this would seem so to be in the usual case and such would be clear if there was no showing that the landlord had retained control of some portions of the demised premises or had covenated to make repairs. See *Altman v. Central New York Bldg. Corp.*, 201 Misc. 27, 106 N.Y.S.2d 695, 697, aff'd. by Appellate Division, 201 Misc. 31, 112 N.Y.S.2d 493 (1951). Other considerations may require the doctrine to be applied, see *Hester v. Hubbuch*, 26 Tenn. App. 246, 170 S.W.2d 922, 927 (Tenn.Ct. of App. 1942) ; *Restaino v. Griggs Motor Sales, Inc.*, 118 N.J.L. 442, 193 A. 543 (N.J.Sup.Ct.1937) ; *Kelly v. Laclede Real Estate & Inv. Co.* et al., 348 Mo. 407, 155 S.W.2d 90, 138 A.L.R. 1065 (Sup.Ct.Mo.1941). These cases are only illustrative of instances—far removed from that being considered here—where Courts have applied the doctrine.

A study of the principles stated in the text of and many of the cases cited in Vol. 2, Harper and James, The Law of Torts, Chap. XIX, §§ 19.5-19.12 and of § 56, Vol. 1, Shearman and Redfield on Negligence (Rev. Ed.) threw very little light on the particular issue as it is presented here. Reading these cited treatises revealed very little aid, particularly in light of the Board's statutory obligation to rent its facilities in the instances stated and the use by the Brookside Players pursuant to a lease arrangement, which did not include the area in which the accident happened, and in light of the Board's Regulations; the lease arrangement was clear—particularly of what areas had been included in the lease arrangement and the extent, if any, of the right reserved in the Board to have supervised tenant's use of all other areas relating to the auditorium.

The ruling of the California District Court of Appeals in *Wilson v. Ray*, 100 Cal.App.2d 299, 223 P.2d 313, 316 (1950) had the closest fact situation which could be found to that here presented (and it was not too close). The Court held there that the doctrine was inapplicable in a suit by a guest of a tenant, against the landlord. The guest had been injured by an exploding gas stove, in the tenant's kitchen, apparently furnished by the landlord. See *Seligman v. Simon*, cited in footnote, supra, p. 459, and compare discussion in Vol. I, Tiffany and Landlord, § 99.

For what it may be worth, I point out that an examination of the Chapter Arrangement, the Indices and the subject matter of and in Powell on Real Estate (6 Volumes and Index Volume) and Thompson on Real Property (10 Volumes and Index Volume), each of which consider a landlord's responsibility to tenants and their guests, does not reveal any reference to or any clue to the application of the doctrine of *res ipsa loquitur* in any case generally pertaining to a liability of landlord to tenants for personal injuries of any kind sustained on the landlord's premises by tenants, customers or guests and particularly of the nature here under consideration. The same may be said of Tiffany, Landlord and Tenant and Volume 32 of American Jurisprudence, in which the subject of landlord and tenant, including personal injury suits, appears.

However in 52 C.J.S. Landlord and Tenant § 443, at pages 130-131, reference is made to the doctrine, when it has been applied and when it is not.

I have examined the greater number of cases cited in the footnotes, both in the Volume itself and the pocket supplement, 11 to 18, on pages 130-131 of 52 C.J.S. Landlord and Tenant and could find no instance where, as here, someone having a relationship to a landlord gra-

tuitously, as a favor and as a matter of accommodation, permitted a tenant to use an appliance or instrumentality on the leased premises and where a Court applied the doctrine of *res ipsa loquitur* to a suit for damages brought by a guest of a tenant against the landlord for alleged personal injuries. See *Lollar v. East Mississippi Oil Company,* 234 Miss. 295, 106 So.2d 65, 66 (Sup.Ct.Miss.1958) and *Lukenbill v. Longfellow Corp.,* 329 P.2d 1036, 1038 (Sup. Ct. Okl. 1958). On analysis of the facts and consideration of the applicable principles underlying the doctrine of *res ipsa loquitur,* I can see no reason to apply it.

*Wright & Taylor, Inc. v. Smith,* 315 S.W.2d 624, 627-628 (Ky.Ct. of App.1958) is distinguishable, since the landlord there had reserved to himself the use of the basement where the plaintiff, an employee of a tenant, was injured by catching her foot in a grease trap located in part of the floor of the basement.

Plaintiff cites *Freund v. Oakland Board of Education,* 28 Cal.App.2d 246, 82 P.2d 197 (Calif.Dist.Ct. of App., 1938), where a California Court upheld the lower Court's application of the doctrine of *res ipsa loquitur* in sustaining an award where a 15 year old school child had been injured when a locker in a room in a public school building fell on the child while she was in school.

The Court said (82 P.2d at page 199) :

"* * * * she was not a tenant. She was a child fifteen years of age. Under the law of this state she was compelled to go to school. Under the law of this state she was compelled to go to the identical school she was attending. Under the law of this state she was compelled to go into the particular room where the accident occurred. She went in there and was seated on a bench. While so seated a part of the fixtures of the building tumbled onto her causing the injury for which she asks damages.

In the trial court the jury heard the evidence and brought in a verdict in favor of the plaintiff. On the defendant's appeal we are asked, in effect, to hold that the plaintiff has shown no actionable wrong. We think she has prima facie shown an actionable wrong. * * * In the instant case there was no satisfactory explanation by the defendant [of how the locker fell] and therefore the judgment must stand. * * *"

Contrast such holding with *Wilson v. Ray*, 100 Cal. App.2d 299, 223 P.2d 313, 316 (California Dist.Ct. of App., 1950), cited supra at p. 463 where a California District Court of Appeals refused to apply the doctrine in a suit by guests of a tenant against a landlord for injuries resulting from an explosion of a gas stove furnished the tenant by the landlord.

I conclude that the doctrine of *res ipsa loquitur* is not to be applied here in view of the lease agreement and other factual matters heretofore discussed. See *Miller v. Weinberg*, Del.Super., 190 A.2d 27, 31 (Super.Ct.1962). "Control", and the extent thereof, of the offending area or instrumentality is an important factor in considering if and when *res ipsa loquitur* applies. I, therefore, conclude to grant the motion for summary judgment, filed by all defendants on the ground plaintiff has shown no facts that relate to the accident that show any liability on the part of the defendants. An order to this effect may be presented.

I entertain much doubt if it is desirable or necessary I consider the question of the right of "Sovereignty" as raised by defendants' Fifth Defense and the motion to dismiss filed by the Attorney General—especially since the plaintiff has not shown a case which entitles him to recover.

In 21 C.J.S. Courts § 182, page 292, the statement is made that a Court will decide only the questions necessary

for determining the particular case presented. On the other hand, 14 Am.Jur.—Courts—§ 50, page 278, states this as the law:

"While courts should not decide more than is necessary to the case in litigation, once they acquire jurisdiction, all material questions are open for their decision. They may properly decide all questions which are so involved, even though it is not absolutely essential to the result that all should be decided. Thus, a court may determine the question of the constitutionality of a statute, although it is not absolutely necessary to the disposition of the cause, if it is involved in the suit and the settlement of the question is one of public importance."

I consider then it is appropriate for me to express my views on this factor of Sovereignty, but since plaintiff has not shown a case where I must decide the question I will refrain from deciding the questions raised.

The right to sue the state—and I assume this includes all state agencies—was recently considered by our Supreme Court in *Shellhorn & Hill, Inc. v. State*, 5 Storey 298, 187 A.2d 71 (1952). It was there held that the "doctrine of sovereign immunity" is a part of the basic law of this state which may be waived solely by law enacted by the General Assembly, 187 A.2d at 74. The Court noted, 187 A.2d 73, the doctrine had been applied to certain sub-divisions of the state; see also *Flait v. Mayor & Council of Wilmington*, 9 Terry 89, 97 A.2d 545, (1953) referred to at 187 A.2d 72, where it was stated that the doctrine is applicable to municipalities "on the theory that they were creatures of the State". No cases involving "school districts" seemingly have been decided in this state,—at least none reported —but it must be recognized that they too "are creatures

of the state". See Title 14 *Delaware Code* generally and in particular 14 *Del. C.* §§ 101, 701, 702, 901 and 902, and I would assume the doctrine is applicable.

Since there is no particular reason now to examine and determine if the doctrine is applicable to school districts, I have given only passing thought to the problem raised by defendants' Fifth Affirmative Defense and the Attorney General's motion to dismiss.

Plaintiff places reliance on 18 *Del. C.* § 516, enacted as Vol. 50 Del.Laws, Ch. 481, and argues this as a waiver of the defense of sovereign immunity. He cites *Dorsey v. Coastal Tank Lines, Inc.*, et al., 11 Terry 437, 442, 133 A.2d 914, 917. I call attention to Judge Christie's ruling, made February 16, 1959, an unreported decision, in the case of *Jamison v. Blagg*, Civil Action No. 743, 1958, in which this Court ruled:

"I conclude that the plain purpose of 50 Delaware Laws, Ch. 481 [now 18 *Del. C.*, § 516] was to make the defense of sovereign immunity unavailable where liability insurance exists. Although the intent of the statute is not as clearly expressed therein as it might be, there is no doubt in my mind that it must be interpreted so as to deny the motion of the School Board.

"I am further of the opinion that the State's point as to the limit on such liability is well taken. Since the waiver of the defense of sovereign immunity depends on the existence of liability insurance, such defense is waived only to the extent that the insurer may be called upon to make payments under the policy. On the other hand, the insurer may not benefit from the failure of the policy to contain a provision as required by 50 Delaware Laws, Ch. 481."

At first blush Judge Christie's ruling seems most sound.

I want, however, it clearly to appear I have not carefully examined or considered the matter other than appears above. I have not determined if a School District can assert the doctrine of "Sovereignty" as a shield to tort liability asserted against a School District, or if not, the extent it has been waived by the cited statute.

Order on notice.